**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**


UNITED STATES OF AMERICA,    )
                           )
        Plaintiff,    )
                           )
                           ) Case No.
      vs.             ) 8:25-CR-311-MSS-TGW
                           )
                           )
SHAWN CHAN,            )
                           )
        Defendant.    )

---

**MOTION HEARING
BEFORE THE HONORABLE MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE**

**SEPTEMBER 26, 2025
9:37 A.M.
TAMPA, FLORIDA**

---

Proceedings recorded by mechanical stenography, transcript produced using computer-aided transcription.

---

**DAVID J. COLLIER, RMR, CRR**
FEDERAL OFFICIAL COURT REPORTER
801 NORTH FLORIDA AVENUE, 7TH FLOOR
TAMPA, FLORIDA  33602

**APPEARANCES:**

**FOR THE GOVERNMENT:**

  Lindsey Nicole Schmidt

  United States Attorney's Office

  400 North Tampa Street, Suite 3200

  Tampa, Florida  33602

  (813) 274-6000

**FOR THE DEFENDANT:**

  Samuel E. Landes

  Federal Public Defender's Office

  400 North Tampa Street, Suite 2700

  Tampa, Florida  33602-4726

  (813) 228-2715

P R O C E E D I N G S

- - - o0o - - -

THE COURT:  Good morning.  Call the case, please.

COURTROOM DEPUTY:  The Court calls Case Number 8:25-CR-311-MSS-TGW, United States of America versus Shawn Chan.

Counsel, please state your appearances for the record, beginning with counsel for the Government.

MS. SCHMIDT:  Good morning, Your Honor. Lindsey Schmidt on behalf of the United States.

THE COURT:  Good morning.

MR. LANDES:  Good morning, Your Honor.  Sam Landes for Shawn Chan, with me here at counsel table.

THE COURT:  Good morning.

Counsel, I understand that you filed a motion to revoke the detention order imposed by the magistrate judge in this case.  Do you want to be heard?

MR. LANDES:  Yes.  Thank you, Your Honor.

Your Honor, I'm always happy to go first.  I did want to point out that the burden is on the Government for both prongs under the Bail Reform Act, and the Government fails at both prongs.

The first prong is whether there's a serious risk of flight.  Here is Mr. Chan, he has no criminal history whatsoever, he doesn't drink or use drugs, he's never been in

trouble before, he wasn't on prior release or anything along those lines.  He was here on a valid visa that remains valid today, and so there's just no risk of -- serious risk of flight, as the statute indicates.

THE COURT:  I don't understand that.  He's here on a visa.  He doesn't belong here.  He has no ties here.  He has no people here.  He apparently had no reason to come other than this illegal reason.  His visa is about to expire, I understand, at the end of November, which would be before we would reasonably expect this matter to resolve, so why wouldn't he go back home?

MR. LANDES:  Well, the Bail Reform Act's question is whether he's a risk to flee, a serious risk to flee, so there's no good reason for him to flee.  In particular, when we start looking at the 3142(g) factors --

THE COURT:  Well, "flee" meaning to go out of the jurisdiction of the Court or something else?

MR. LANDES:  Deliberately flee, Your Honor, and I won't have the citation ready, Your Honor, but United States versus *Ailon Ailon* has to do with -- and I think it's a Seventh Circuit case, has to do with what the burden is.  The burden is for the Government to show that he's a serious risk to flee, not to disappear or get disappeared by the Government by deporting him after his visa were to expire, so --

THE COURT:  So your notion is that the Government

will not be able to demonstrate that Mr. Chan has a serious risk of fleeing, i.e. going to Canada, outside the jurisdiction of the Court?

MR. LANDES: I agree, Your Honor. Yes.

THE COURT: That's what you're saying the Government has to show?

MR. LANDES: Yes, Your Honor. Yes, Your Honor.

THE COURT: All right.

MR. LANDES: To avoid the jurisdiction of the Court, to deliberately flee; and that he does not have. The best the Government can say is he has a passport and he can go to Canada. That's true of most of the defendants before this Court. And should the Court get to the second prong, the Court could require that he forfeit the passport to Pretrial Services. So this is a defendant who does not have any greater risk to flee than any other we normally see, and not by a preponderance of the evidence does he have a serious risk to flee.

The Government's case is even worse at the second prong if the Court were to get to it. There are four factors the Court is supposed to consider and none of them favor detention in this case.

I think it's important to frame the question correctly. The question is whether conditions of release are sufficient to prevent him from fleeing, from fleeing the

jurisdiction. There is a second question as to how to keep the victim safe, for instance, but that question only comes into play once the Courts decide to release him and starts to figure out what the conditions of release should be. So each of the 3142(g) factors favors release.

The first is the nature of the offense. The nature of the offense has nothing to do with a likelihood he would flee. Again, the best the Government can say is, well, he can cross international borders. That's true of most anybody, and he can be put on location monitoring and can forfeit his passport.

The second is the weight of the evidence. The evidence is not strong. The reason for that is, as we've proffered, Mr. Chan has a delusional disorder. The delusional disorder causes him to have a sincere belief that he's in this friendly relationship with a professional wrestler. The Government's burden at trial would be to prove that he intended to harass or intimidate this person, but because he has a sincere delusion, he thought this is just somebody he could come calling on, and so his incentive is not to flee, his incentive is to come to trial and seek his own acquittal.

THE COURT: If he thought that, why didn't he just go knock on the door frontways to contact his friend?

MR. LANDES: That's a good question, Your Honor. I'm not sure, and he --

THE COURT: Well, isn't the reasonable inference there that he didn't believe that and that he was stalking the victim? And didn't he say that he is his stalker, even if facetiously?

MR. LANDES: He did, Your Honor. He said something along the lines of "Now I look like a stalker." Your Honor, that may well be, but it's not stalking in the general sense, it's stalking in a very specific sense that the statute lays out, and that's --

THE COURT: Why would you go under someone's mat to try to look around for a key to go into their home, and why would you pick up a rifle the person left out and try to use that to force your way into the house if you thought you were a friend and were just coming to pay a visit?

MR. LANDES: Because he is so severely delusional that he thinks that's the sort of thing he can do.

THE COURT: Well, he can't be delusional, thinking he's a friend, and then be delusional thinking he's free to break into somebody's house at the same time. He has to pick the delusion he's operating under, and so is it the friend delusion or is it the delusion that breaking into someone's home and trying to find their key and then going to their place of work is something he is permitted to do for some other reason?

MR. LANDES: I think it's for the same reason,

Your Honor. I have friends that I could walk into their home because I'm so close with them.

THE COURT: You don't go to your friend's house and pick up the rifle on their front porch and dig around in their rug to find a spare key and go in the back yard and look into the windows. You don't do that to your friends, Mr. Landes. I hope not. I don't want to be your friend if that's what you do.

MR. LANDES: Understood, Your Honor. Your Honor, I think I could though, and if I had a severe delusion, that might be something that would happen. But the Government's burden -- all of this is a great question for the jury, and that's -- that's the reason that he has no incentive to flee. Not no incentive to flee, but his risk of flight is not so high that there is no possible set of conditions that would reasonably assure his appearance, which is what the Court has to find, and we would reasonably assure his appearance.

So these are great questions. They're great questions for the jury. These are questions that the defendant looks forward --

THE COURT: When it goes to the question of the strength of the evidence is where you were going with it, and the evidence is quite strong, not weak, but go ahead, what other element are you relying on?

MR. LANDES: Yes, Your Honor. There's the history

and characteristics of Mr. Chan. Again, to repeat from the first prong a little bit, this is a defendant with no criminal history, this is a defendant who just does not drink or use drugs, this is a defendant who has secured housing in the district.

THE COURT: How are we going to treat his delusion though? He's now delusional, so maybe he thinks in that delusion he can just go back home.

MR. LANDES: Well, he can get mental health treatment, Your Honor, and that should be a condition that the Court imposes if he's released. He can get antipsychotics and start getting treated for the delusion.

THE COURT: Has he been diagnosed?

MR. LANDES: Yes, Your Honor. Yes, Your Honor. We got him evaluated, and that was the-- the diagnosis was delusional disorder.

So he can be nearby the district, he can -- he kind of pays his own way at the rehabilitation center by unloading donations for Salvational Army. He can be put on an ankle monitor so we know right where he is. He can be told to stay away from the victim, because once the Court chooses to release the defendant, the Court can protect the victim with those conditions of release. He can be required to go to mental health treatment so he can start getting treated for his delusional disorder, and his delusional disorder -- his

disorder is not such that he can't comply with requirements. He may think that he's very friendly with a professional wrestler, but the Court could order him to stay away from the professional wrestler nonetheless, and there's no reason to think that he wouldn't be able to comply with that because of his delusional disorder.

Your Honor, the last factor is the nature of any danger to the safety of others. That has nothing to do with non-appearance in this case. There could be a case where that would suggest that a defendant would flee for some reason, but this is not that case.

That leads me to sort of the legal dispute that the parties have and that the magistrate judge relied on, which is that he should just be detained as being a danger to the safety of the victim.

Your Honor, that's not an appropriate consideration given what he's charged with. He's not charged with one of the 3142(f)(1) crimes, and so the danger to the safety of others is only appropriate as a consideration for the conditions of release that he should be released on. He should not be detained under *Salerno* simply because there's some danger to the community unless one of those triggering crimes is the crime under Indictment, and because the crime under Indictment is not one of the crimes under (f)(1), he can't be detained simply because he's a danger to someone else. He can be put on

conditions to prevent him from being a danger to someone else, and we welcome that, but the magistrate judge detained him simply because he was a danger to someone else and this is not the appropriate case for that.

THE COURT: Did you file the mental health report?

MR. LANDES: No, Your Honor. No.

THE COURT: Do you have it?

MR. LANDES: I could get it pretty easily, Your Honor.

THE COURT: But what does it say?

MR. LANDES: It says that he has a delusional disorder, just simply meaning -- we were looking at competency at the time, Your Honor, he's competent to proceed to trial, so it says he's competent to proceed to trial and that he suffers from a delusional disorder.

THE COURT: All right.

MR. LANDES: Thank you.

THE COURT: Let me hear from the Government.

MS. SCHMIDT: Thank you, Your Honor. I'll start first by responding to the legal argument that "dangerous" can not be considered.

What the case law says is that there's an initial burden by the United States to show that a detention hearing is appropriate. Once that burden is met then we move to the 3142(g) factors, one of which is reasonable conditions that can

assure the safety of the community; in this case that would include the victim. Here the United States has demonstrated and provided ample evidence that Mr. Chan is a serious risk of flight. There are certain factors that can be weighed into whether a person is a risk of flight, including their lack of a permanent address, their ties to the community and employment status, as well as the length of prison time that they are potentially facing.

Here, as the Court has already established, Mr. Chan does not have an address here, he actually has not a single tie to the Middle District of Florida other than his perceived delusion with the victim, he traveled here under a visa that will no longer be valid in a few months, and he's also facing significant prison time. Even given the fact that he has no criminal history, my back of the guidelines calculation is somewhere between 33 and 41 months, which is lower than what we see for a number of defendants, but for someone who is not from this country and is his first offense, that's significant Federal prison time, Your Honor.

If, on the other hand, Mr. Chan were to flee to Canada --

THE COURT: What are his ties in Canada?

MS. SCHMIDT: He has -- all of his family is in Canada. It's my understanding that he's not particularly in contact with them, but his mother and father are in Canada,

Your Honor.

THE COURT: And does he work there?

MS. SCHMIDT: I know he has some employment. I know he had approximately $17 to his name. He told Pretrial Services that he does work. I do know that under the visa here he cannot earn wages in the United States.

So, Your Honor, the United States has established that Mr. Chan is a serious risk of flight for triggering the detention hearing. Then we'd move to the 3142(g) factors, which do favor detention as well. I won't reiterate all the nature and circumstances of the offense -- of the offense, there have been two detention hearings, a Complaint, and -- the seriousness of his conduct though cannot be understated.

He flew to the Middle District of Florida for the sole purpose of intimidating and harassing the victim. He went to her house, he held a rifle, he shuffled under her mat, he tried to open doors. He left a note that I would argue is quite an intimidating note. "I came here to pay a friendly visit, nothing more. I'm the one that looks like a stalker. Yeah. I just wanted to let you know I was here." And those -- those nature and circumstances, Your Honor, weigh in favor of detention.

Next, the evidence is quite strong, again, for the same reasons, he traveled here for the sole purpose -- there's not a single reason that he was in the United States aside for

this apparent delusion with the victim. And it certainly wasn't a friendly visit. The photograph included -- and I point Your Honor to the exhibit attached to the second detention hearing as well as in the Complaint of the defendant holding the rifle at the front door. Certainly it's not a friendly visit, and, again, he went there for the sole purpose of attempting to intimidate her and he succeeded. She needed a police escort to return to her home because at the time Chan's whereabouts were unknown.

And the history and circumstances -- although the defendant does not have criminal history, the rest of the factors set forth in 3142(g)(3)(C) are -- they do weigh in favor of detention. Again, I won't reiterate, but no ties to the Middle District of Florida, he's on a B1 visa that's going to expire, and he has significant mental health issues, including a delusional disorder that apparently makes him think that he has some relationship with the victim that he does not. The United States has serious concerns about whether or not the defendant would abide by any conditions to not visit her or speak to her or try to connect with her, because he traveled across state -- or international borders to meet her. What's going to stop him from going up the street?

Which leads to the Salvation Army. It's my understanding, Your Honor, that that is a completely voluntary program, there would in essence be no repercussions by the

Salvation Army if he were to pay a visit to the victim, if he were to not return. He can't work, he can't earn wages, and so that does not alleviate all the concerns that the United States has set forth.

And that leads to the third factor -- or the fourth factor of the 3142(g) factors, danger to the community. He is certainly a danger to the victim and others in the community, given his delusional disorder and his conduct in this case, for all the reasons that have been set forth here today as well as the previous two detention hearings and the United States briefing.

And so for those reasons, Your Honor, it's the United States' position that there are no reasonable conditions of release that can assure not only his appearance but the safety of the community.

THE COURT: Thank you.

Anything further from you, Mr. Landes?

MR. LANDES: Briefly, Your Honor. Thank you.

Your Honor, the Government would make a wonderful argument if the Court were allowed to detain Mr. Chan on the basis of his dangerousness to the victim. So I'll just point out one part of the Government's argument. The Government says that they feel that there's no condition that would keep him from visiting the victim. That is a reason to put strict conditions on him, it's not a reason to detain him in jail.

So that goes back to the sort of fundamental legal dispute that we have as to whether a defendant who doesn't qualify under (f)(1) can be detained because of his dangerousness. There's a long line of cases that says he cannot. I think the best is *United States versus Byrd* out of the Fifth Circuit. The first really is *United States versus Himler*, which talks about the -- really the two different prongs to the Bail Reform Act. One, there has to be -- that you don't even get a detention hearing if the only reason for it is the dangerousness to the community; but, secondly, the dangerousness to the community or to any person only comes into play once the Court has decided to release the defendant and then has to fashion conditions of release that will assure the safety of the community.

So almost -- the thrust of almost all of the Government's argument is to make it look like he's a danger to the community. That's a reason to put him on an ankle monitor, that's a reason to order him to stay away from the victim, that's a reason to send him to mental health treatment, but that's not a reason to detain him in jail because that would be an impermissible reason to detain him.

Thank you, Your Honor.

THE COURT: Thank you.

This work for rent policy of the Salvation Army is consistent with Mr. Chan's visa status?

MR. LANDES: As I understand it, it is, Your Honor.

He's not allowed to work for wages, I agree with that.

THE COURT: So he can work for in-kind benefits?

MR. LANDES: I don't know the answer to that, Your Honor.

THE COURT: All right.

MR. LANDES: I think that's a separate question though, because even if he were not permitted to, it's not as if the Salvation Army is going to kick him out. If the Government gets mad that he's working for in-kind benefits and they want to deport him or something like that, or charge him for doing so, that's a whole separate matter. The question here is whether there's conditions of release that will reasonably assure his appearance.

THE COURT: The Court finds that the defendant should remain detained pending the resolution of this case. The Court can conclude from the record before it that this defendant is a serious risk of flight. He has no ties to the Middle District, he has no resources in the Middle District, he came here, it appears, for the sole purpose of carrying out this assault or stalking of his victim, and came here, it appears, a day after he received his travel papers and went to the victim's house to carry out this conduct. He is unlike other people who have a passport who could go out of the country, because those other people have ties to the country they're in, family in the country they're in, children in the country they're in, jobs in

the country they're in, the right to be in the country they're in, so it's not as likely or even likely at all that someone facing the kind of charge that Mr. Chan is facing would flee to a foreign country to avoid answering to those charges.

Admittedly, according to the defendant, he suffers from a delusional disorder. Even more reason he would flee, because maybe he doesn't appreciate what it means to not do something he's not supposed to do. He has no connection to the Salvation Army. I don't know how he would be able to work for in-kind status, i.e. work to pay his rent, the way that is described, but even if he could and then would, there's no basis to believe that he would stay at a place that doesn't confine him. He won't be confined, he's there of his own free will and volition, and he could just walk away from the property.

Ankle monitors would probably be very unhelpful because he could just cut it off and before we know it he would be out of the country or out of the jurisdiction of the Court. He has nothing, so he could lay low and be undetectable and unlocatable by the Court.

So the Court finds that he is a serious risk to flee and that there are no means by which the Court would secure him, no money, no bond, no detention outside of full detention that could assure his appearance to answer these charges. In addition to that the Government's evidence is quite strong

that the defendant committed the offense that he is charged with, and while he has no prior criminal history, because of the nature of the offense, he faces significant potential penalties if he is convicted. His crime is a dangerous and unsettling one, he remains a danger to the victim, and the Court does not believe there are any terms and conditions that would assure against his severe flight risk or to protect the community from his continued presence unincarcerated, and so the Court would decline to revoke the detention order of the magistrate judge, and I do mean to include that the defendant's status here is likely to terminate before the case resolves, which is in December, in which case its query whether the Salvation Army could even provide him a place to stay in a country where he's not legally supposed to be present.

All of those factors and all of those circumstances warrant the denying of the motion to revoke the order of detention, curing any defect in that order of detention by finding that the defendant is a severe flight risk that cannot be resolved through other means.

Is there anything further from the Government?

MS. SCHMIDT: Nothing from the United States, Your Honor.

THE COURT: From the defense?

MR. LANDES: No, thank you, Your Honor.

THE COURT: You thank. We're dismissed.

- - - - -

(Proceedings concluded at 10:02 a.m.)

- - - - -

C E R T I F I C A T E

This is to certify that the foregoing transcript of proceedings taken in a motion hearing in the United States District Court is a true and accurate transcript of the proceedings taken by me in machine shorthand and transcribed by computer under my supervision, this the 5th day of January, 2026.

/S/ DAVID J. COLLIER

DAVID J. COLLIER

OFFICIAL COURT REPORTER0