# U.S. District Court
# Middle District of Florida
# Tampa Division

# GOVERNMENT EXHIBIT

**Exhibit No.**:  3

Case No.: 8:25-cr-311-MSS-TGW

UNITED STATES OF AMERICA

vs.

 SHAWN CHAN

Date Identified: _____

Date Admitted: _____



**Neuro-Rehab Psychology Group of Tampa, LLC**
5421 Beaumont Center Blvd. Suite 650 | Tampa, FL 33634
Phone: 813-992-9978 | Fax: 813-489-2592

## Neuropsychological Evaluation
*Confidential*

NAME: Shawn Chan
CASE # 8:25CR311MSS-TGW
FPD # FLMTP2025-554
DOB: ███████
DOE: 10/24/2025
CONSULTANT: Michelle Ayala-Feliciano, Psy.D.

REQUESTING ATTORNEY: Samuel Landes, Esq.

## CLINICAL INTERVIEW

REASON FOR REFERRAL: Mr. Shawn Chan is a 42-year-old male referred for a neuropsychological evaluation by Samuel Landes, Esq. Assistant Public Defender. The independent evaluation aims to assess Mr. Chan's cognitive, emotional, and behavioral functioning, and to analyze possible insanity at the time of the offense and potential dangerousness for placement in the community. The neuropsychological examination was conducted in Mr. Chan's secondary language, English.

Mr. Chan was informed about the nature of the consultative examination and the limits of confidentiality. He was told that no doctor-patient relationship or privileges would be established. The information in this report was obtained from a clinical interview with Mr. Chan, test results, behavioral observations, and a review of available records provided by the Office of the Federal Public Defender.

RELEVANT BACKGROUND: As a child, Mr. Chan was emotionally neglected and physically punished by his parents. From a young age, he had a special interest in video games and technology. He reports a history of depression with periods of increased energy despite inadequate sleep. However, he never sought mental health treatment. In May 2025, Mr. Chan traveled from Canada to Florida to meet a professional wrestler he allegedly met while playing Final Fantasy. He said, "I intended to meet her, say hello, spend time with her, and do activities I promised in the game, such as being in a relationship." Cognitively, Mr. Chan doesn't report a history of acquired neurocognitive disorder. He does not report a history of alcohol or illicit substance use.

PSYCHOSOCIAL HISTORY: Mr. Chan was born in Hong Kong. He was raised by both parents alongside an older sister. Mr. Chan reports emotional neglect and physical mistreatment as a child. He indicates that his father was emotionally neglectful, always putting himself first, and that his mother physically punished him if he didn't eat all the food on his plate. In June 1990, Mr. Chan relocated with his immediate family to Quebec, Canada. He states that he speaks Cantonese, English, and French fluently. Growing up, Mr. Chan says he felt alienated because he was the only Asian at school. He describes his relationship with his sister as "nothing special."

In 2002 or 2003, Mr. Chan ran away from home and flew to Hong Kong to reconnect with his grandparents and relatives. At the time, he was in a romantic relationship in Hong Kong. About six months later, he returned to Quebec and, in 2005, decided to move to Ontario. It was then that his relationship with his family became significantly strained. For over 20 years, Mr. Chan lived in a house with one male and two female friends. He stated, "I believe something happened between my roommates and the WWC. That's why I felt betrayed, disappointed, and depressed." Besides technology and video games, he reported an interest in acting and glamour work, specifically working with professional wrestlers.

EDUCATIONAL HISTORY: When Mr. Chan moved to Quebec, he had to repeat first grade because his French was not fluent enough. He earned a high school diploma and then attended college for a year. He withdrew because he didn't like accounting. After returning from Hong Kong, he earned a certificate in information technology in 2007. According to Mr. Chan, he has always considered himself a good student.

OCCUPATIONAL HISTORY: Mr. Chan was self-employed as a computer technician for more than 10 years.

SUBSTANCE USE HISTORY: There is no reported history of alcohol, tobacco, or illicit substance use.

MENTAL HEALTH HISTORY: According to Mr. Chan, he has never sought mental health treatment. However, he reports a history of periods of depression and anxiety. He also reports a history of suicidal ideation, specifically when he went to Hong Kong to visit his extended family and after his arrest in May 2025. He also indicated periods of sadness, depression, indifference, boredom, and low motivation by stating, "My life was nothing special."

For two years before the arrest, Mr. Chan experienced significant anxiety with difficulty sleeping. The longest he has been without sleep is 20 hours. He reportedly felt refreshed with four hours of sleep. During periods of elevated mood, he reportedly spent his time creating YouTube content. He said, "The videos took longer and longer. So, I had sleepless nights." There were times he felt refreshed after a short nap. In Florida, the longest time he spent without sleep was 72 hours.

According to Mr. Chan, he hasn't been able to advance in his IT career due to concerns that wrestlers and Hollywood would steal his ideas. There were instances in which he believed players were speaking directly to him through the TV. He states that he has had these ideas for over 15 years.

Family mental health history is unknown to Mr. Chan.

MEDICAL HISTORY: Besides HIV testing, he hasn't had a formal medical evaluation and blood work since high school.

RECORD REVIEW: All records provided by the Office of the Federal Public Defender have been reviewed in their entirety.

A psychological evaluation was conducted by Debra A. Goldsmith, PhD, on August 16 and August 30, 2025, at the Hernando County Jail. According to that evaluation, the defendant reported locating the home address of a professional wrestler, traveling to her residence, and leaving a note after being denied entry to WWE offices. He stated that he wished to speak with the co-founder of WWE, whom he believed had used his ideas and artistic concepts from an online video game he developed in 2009-2010. He also reported knowing the alleged victim since high school, prior to her becoming famous. During the interview, the defendant was cooperative but appeared paranoid and guarded, and denied experiencing symptoms typically associated with mental illness. Dr. Goldsmith concluded that the defendant was competent to proceed, and diagnoses of delusional disorder and adjustment disorder with depressed and anxious mood were rendered.

**NEUROPSYCHOLOGICAL ASSESSMENT**
PROCEDURES: Record review, consultation, one face-to-face contact session at the Hernando County Jail, comprehensive clinical interview, administration of neuropsychological instruments, structured interview for criminal responsibility, behavioral observations, scoring and interpretation of test results, clinical diagnosis, report writing, and recommendations. The neuropsychological clinical interview and

all other examination procedures were conducted solely by Dr. Michelle Ayala, clinical psychologist/neuropsychologist.

MEASURES ADMINISTERED: Dot Counting Test (DCT), Reliable Digit Span (RDS), Repeatable Battery of the Assessment of Neuropsychological Status (RBANS-A), Test of Premorbid Functioning (TOPF), Wechsler Adult Intelligence Scale (WAIS-IV), Controlled Oral Word Association Test (COWAT; FAS, Animals), selected subtests from the Delis-Kaplan Executive Function System (D-KEFS), Historical-Clinical-Risk Management-20, V3 (HCR-20-V3)

**BEHAVIORAL OBSERVATIONS**
The clinical interview and neuropsychological testing were conducted in a single session at Hernando County Jail. Mr. Chan was alert and oriented to all spheres. His appearance was disheveled, and he was dressed in an inmate uniform. His attitude was cooperative, although suspicious and guarded. Nonetheless, eye contact was maintained, and rapport was successfully established. No gait abnormalities were observed, and psychomotor activity was appropriate. Both expressive and receptive language skills were adequate for evaluation. Conversational speech was spontaneous and soft. Thought processes were generally goal-directed, but tangential at times. Thought content included obsessions, delusions of grandeur, erotomania, and paranoia. Active hallucinations were neither observed nor reported. Mood was sad, and his affect appeared mildly anxious. He denied suicidal or homicidal ideations.

Attention and concentration were adequate. Immediate and delayed memory were adequate. Remote memory appeared fair to good. Mr. Chan exhibited fair to good social skills. He frequently asked to read the undersigned's notes. Judgment regarding self-care and social problem-solving was poor. Insight into his mental health symptoms was evaluated as fair to poor. His general knowledge was considered sufficient based on his vocabulary and grasp of common information. Mr. Chan demonstrated adequate effort during the neuropsychological assessment, and the results accurately reflect his cognitive abilities.

**RESULTS**
PERFORMANCE VALIDITY AND EFFORT: Performance validity was evaluated using embedded and stand-alone effort measures. Mr. Chan achieved a Reliable Digit Span score of 19, which is above the established cutoff and indicates adequate attention and effort during testing. Performance on the Dot Counting Test was also within the normal range, further supporting the validity of test engagement. Taken together, these results suggest that Mr. Chan's test performance represents a reliable and accurate reflection of his current neurocognitive functioning, and there is no evidence of suboptimal effort or response exaggeration during the evaluation.

PREMORBID COGNITIVE ABILITY: Mr. Chan's premorbid intellectual functioning was estimated using the Test of Premorbid Functioning. Mr. Chan obtained a standard score of 114, corresponding to the 82nd percentile, which falls within the high average range. This result suggests that, before the onset of psychiatric symptoms or other potential interfering factors, Mr. Chan likely functioned at a high average level of general intellectual ability.

SCREENING MEASURE: Mr. Chan's total score on a neuropsychological screening measure was 102 (55th percentile), indicating overall cognitive functioning within the average range. Attention (97; 42nd percentile), immediate memory (103; 58th percentile), and delayed memory (103; 58th percentile) were all within the average range, suggesting intact basic attention and memory abilities. Visuospatial and constructional skills were a notable strength, falling in the exceptionally high range (126; 96th percentile). In contrast, language functioning was in the low average range (83; 13th percentile), reflecting a relative weakness compared to other domains. Overall, the screening profile indicates generally intact cognitive functioning with an uneven pattern characterized by strong visuospatial abilities and comparatively reduced language efficiency.

Shawn Chan
Page **3** of **10**

INTELLECTUAL ABILITY: Mr. Chan's intellectual functioning was assessed using the WAIS-IV. He obtained a Full-Scale IQ of 110, placing him at the 75th percentile and within the high average range. This result indicates overall intellectual abilities above the normative mean and generally consistent with his estimated premorbid level of functioning.

ATTENTION, PROCESSING SPEED, AND MENTAL FLEXIBILITY: Attention, processing speed, and mental flexibility were generally intact. Visual scanning and visual search efficiency were exceptionally high (98th percentile), reflecting highly effective attentional control for visually presented information. Working memory was within the average range overall (105; 63rd percentile), indicating adequate capacity to hold and manipulate information in mind, with relative strength in mental calculation and quantitative reasoning (84th percentile). Processing speed was within normal parameters (102; 55th percentile), reflecting age-appropriate efficiency in rapid visual-motor processing. Nonverbal reasoning and visual-spatial problem solving were also within the average range (50th percentile). Overall, these findings indicate preserved attentional capacity, cognitive efficiency, and mental flexibility, with a notable strength in visually guided attention.

LEARNING AND MEMORY: Learning and memory abilities were largely intact. Initial acquisition of new verbal information fell within the high-average range (75th percentile), indicating efficient learning. Recall and recognition of verbal material were in the average to high-average range (51st-75th percentiles), suggesting adequate retention and retrieval over time. Memory for contextualized verbal information was average, with both immediate and delayed recall falling within expected parameters (25th-37th percentiles). Visual memory performance was also average (63rd percentile), reflecting intact retention of nonverbal information. Overall, results indicate preserved learning and memory abilities across verbal and visual domains, without evidence of clinically significant memory impairment.

LANGUAGE SKILLS: Language abilities were overall well preserved, with an uneven profile. General verbal reasoning and comprehension were in the high average range (Verbal Comprehension Index = 112; 79th percentile), indicating a strong understanding of verbal concepts and relationships. Measures of word knowledge and stored factual information were particular strengths, with performance ranging from high average to exceptionally high (75th-91st percentiles). Verbal fluency was intact, with average performance on letter-based word generation (42nd percentile) and exceptionally high performance on category-based word generation (97th percentile), reflecting efficient lexical access and retrieval under timed conditions. In contrast, confrontation naming of pictured objects was exceptionally low (<2nd percentile). This result should be interpreted with caution, as picture naming tasks are known to be sensitive to linguistic and cultural factors. Given that Mr. Chan's first language is Cantonese and that English is a later-acquired language, reduced performance on this task may reflect second-language effects rather than a primary language impairment.

Overall, the findings suggest broadly intact language functioning, with a focal weakness in picture naming that is likely influenced, at least in part, by linguistic background rather than a generalized deficit in language abilities.

VISUOSPATIAL/CONSTRUCTIONAL SKILLS: Visuospatial and constructional abilities were a clear area of strength. Performance on tasks assessing basic spatial perception and orientation fell in the high average range (>75th percentile), indicating accurate perception of spatial relationships. Overall, nonverbal reasoning and visual-spatial problem solving were also in the high average range (Perceptual Reasoning Index = 109; 73rd percentile), reflecting a strong ability to analyze and reason visual information. Performance across tasks requiring detection of visual patterns, mental manipulation of spatial information, and construction of designs ranged from average to high average (50th-84th percentiles). Visual construction and organization were also high average (84th percentile), indicating

effective planning and execution when reproducing complex figures. Overall, these results reflect well-developed visuospatial perception, nonverbal reasoning, and constructional abilities.

EXECUTIVE FUNCTIONING: Overall, executive functioning was well preserved, with several strengths and one notable weakness. Performance on tasks assessing sequencing, visual scanning, and cognitive flexibility ranged from high average to exceptionally high (75th-91st percentiles), indicating a strong ability to sustain attention, follow ordered sequences, and shift efficiently between mental sets. Speeded tasks requiring rapid verbal output, visual processing, and cognitive control were also strong, with performance in the high average to exceptionally high range (84th-95th percentiles), reflecting effective inhibitory control and efficient regulation of automatic responses under timed conditions.

Abstract reasoning abilities were intact, with nonverbal reasoning in the high-average range (75th percentile) and verbal abstract reasoning in the average range (63rd percentile), suggesting adequate capacity for concept formation and problem-solving. Verbal fluency under letter-based constraints was average (42nd percentile), indicating age-appropriate self-initiated word generation.

In contrast, performance was well below average on a task requiring comprehension and execution of complex, multi-step verbal commands. This isolated weakness may reflect interference from thought-content disturbances, such as preoccupations, rigid beliefs, or delusional ideation, which can disrupt sustained attention and integration of verbally presented information despite otherwise intact executive skills. Overall, the pattern suggests preserved executive functioning with a focal vulnerability under conditions of increased cognitive load and internal distraction, rather than a global executive deficit.

MOTOR SKILLS: Motor functioning was intact. Fine motor speed was in the high-average range (75th percentile), indicating efficient manual output and coordination. These results do not suggest clinically significant motor slowing or dexterity impairment and are consistent with age-appropriate motor functioning.

VIOLENCE RISK ASSESSMENT: Historical-Clinical-Risk Management-20, V3 (HCR-20-V3)
*Historical risk factors:* Mr. Chan's background is notable for early emotional neglect, physical punishment, and social alienation, which contributed to longstanding interpersonal instability and difficulties coping with rejection. He has experienced chronic estrangement from his family, limited stable relationships, and a pattern of reliance on imagined or parasocial connections. Additionally, he reports longstanding unusual beliefs and suspiciousness spanning more than 15 years, suggesting an untreated major mental disorder with early onset and persistence over time.

*Clinical risk factors:* Mr. Chan currently exhibits active symptoms consistent with a delusional disorder, including fixed persecutory and grandiose beliefs involving public figures and the conviction that his ideas have been stolen. These beliefs have been accompanied by poor insight, guardedness, and denial of mental illness. He has also experienced significant mood disturbance, anxiety, and severe sleep disruption, including prolonged periods of minimal or no sleep, which may further impair judgment and increase behavioral disinhibition. Importantly, his psychotic beliefs have been acted upon, as evidenced by travel across international and state boundaries, attempts to access organizations, and approaching a specific individual's residence.

*Future risk management factors:* Looking forward, Mr. Chan faces ongoing destabilizing stressors, including legal proceedings, perceived rejection, and continued fixation on individuals linked to his delusional system. He lacks a history of mental health treatment, has limited protective supports, and demonstrates minimal insight into his condition, all of which reduce the likelihood of voluntary risk mitigation. His demonstrated ability to locate, travel to, and approach identified targets increases the

Shawn Chan
Page **5** of **10**

feasibility of recurrence. In the absence of structured supervision and psychiatric intervention, these factors suggest an elevated risk for continued intrusive or stalking-type behaviors with potential for escalation, posing a foreseeable risk to community safety.

CRIMINAL RESPONSIBILITY EVALUATION/INSANITY AT THE TIME OF THE ALLEGED OFFENSE: An evaluation of criminal responsibility was ordered to determine, specifically, whether, at the time of the alleged offense, he was unable to appreciate the nature and quality, or the wrongfulness, of his actions as a result of a severe mental disease or defect, pursuant to 18 U.S.C. § 17. This opinion is based on a structured forensic interview with Mr. Chan and his statements regarding the alleged offense.

Mr. Chan traveled from Canada to Florida in May 2025. At the time of the alleged offense, he was unemployed and living transiently, staying at the airport and in hotels. He denied any history of psychiatric treatment or behavioral health counseling. He also denied the use of alcohol or illicit substances.

*Mental State at the Time of the Alleged Offense:* During the interview, Mr. Chan described a longstanding belief system involving professional wrestling figures and entertainment industry executives. He reported that beginning in adolescence, he developed ideas for characters and storylines that were later adopted by professional wrestlers. He stated that he believed certain wrestlers he encountered online were connected to him through this intellectual property and that he was owed recognition and financial compensation.

Mr. Chan reported that he believed a well-known professional wrestler was his significant other. He described traveling to Florida with the intention of contacting senior figures in professional wrestling through her and believed that visiting her residence was appropriate and justified. He stated that he left a letter at the front door of her home, slept on the porch, and attempted to enter the residence after hearing noises, believing he was checking on her safety. Mr. Chan endorsed beliefs involving a global conspiracy related to weapons and terrorism and described prominent entertainment figures as participating in efforts to combat this conspiracy. These beliefs were described as factual and accurate by Mr. Chan at the time of the offense.

Mr. Chan denied experiencing hallucinations. He described his thoughts as clear and organized and reported feeling emotionally "normal" at the time of the alleged offense. His behavior appeared goal-directed and internally consistent with his belief system.

*Understanding of Wrongfulness at the Time of the Alleged Offense:* Mr. Chan stated unequivocally that at the time of the alleged offense, he believed his actions were right. He reported that he did not believe his actions were unlawful and that he realized their illegality only after his arrest. He did not report any efforts to conceal his conduct and described proceeding openly to attend a wrestling event with the intention of meeting the individual he believed to be his significant other.

Mr. Chan's belief that the alleged victim was his partner significantly affected his understanding of the nature and wrongfulness of his conduct. Within this belief system, his actions were perceived as appropriate relationship-based behavior rather than criminal conduct.

*Rationality and Appreciation of the Nature and Quality of the Acts:* Mr. Chan demonstrated awareness of his physical actions but did not demonstrate an accurate appreciation of their true nature or social and legal meaning. His understanding of events was fundamentally distorted by fixed false beliefs regarding his relationship with the alleged victim and his role in a broader conspiracy. His planning and purposeful behavior were based on these beliefs rather than on an accurate perception of reality.

Although the defendant reported acting according to a plan and experiencing a sense of autonomy, the plan itself was predicated on delusional assumptions. The presence of organized behavior does not preclude the existence of a severe mental disease or defect when the behavior is driven by psychotic beliefs.

*Post-Offense Mental State and Insight:* Following the alleged offense, the defendant reported feeling depressed and confused about potential legal consequences. He denied believing that he was mentally ill at the time of the offense and expressed uncertainty about whether mental illness caused his behavior. He stated that he would not act differently if placed in the same situation again and continued to express a desire to see the alleged victim, indicating persistence of the underlying belief system. The continuation of these beliefs after arrest suggests that they were not situational, exaggerated, or fabricated for secondary gain.

Based on the defendant's statements and behavior as described above, there is evidence that at the time of the alleged offense, the defendant was experiencing a severe mental disease characterized by fixed delusional beliefs, including grandiose, persecutory, and erotomanic themes.

As a result of this mental disease, the defendant's perception of reality was significantly impaired. Although he was aware of his physical actions, he was unable to appreciate the wrongfulness of his conduct at the time of the alleged offense. His actions were understood by him to be appropriate and justified within the context of his delusional belief system.

It is therefore the opinion of this evaluator, based on the information available, that at the time of the alleged offense, the defendant was unable to appreciate the wrongfulness of his actions as a result of a severe mental disease, consistent with the federal standard for insanity under 18 U.S.C. § 17.

**SUMMARY AND CLINICAL IMPRESSION**

Mr. Chan underwent a comprehensive forensic neuropsychological evaluation to assess cognitive functioning, mental status, violence risk, and criminal responsibility in the context of an interstate stalking charge. Performance validity measures indicated adequate effort and reliable engagement, supporting the interpretability of the test results. Neuropsychological testing revealed overall intact cognitive functioning, with intellectual abilities in the high average range and no evidence of an acquired neurocognitive disorder. Attention, processing speed, working memory, learning, memory, visuospatial, and constructional abilities were generally preserved, with several areas of relative strength, particularly in visuospatial reasoning and visual attention.

Language abilities were broadly intact, with strong verbal reasoning, vocabulary, and semantic fluency. An isolated weakness in confrontation naming was identified and is most parsimoniously explained by linguistic and cultural factors, as English is not Mr. Chan's first language. Executive functioning was largely intact, with strong performance in sequencing, cognitive flexibility, inhibition, and cognitive control. A focal weakness was observed on a task requiring comprehension and execution of complex verbal commands, likely reflecting interference from internally driven thought content rather than a primary executive deficit.

From a neuropsychological perspective, Mr. Chan demonstrated prominent disturbances in thought content, including fixed grandiose, persecutory, and erotomanic delusions that have persisted for many years and were active at the time of the alleged offense. Insight into these symptoms was limited, and judgment regarding social boundaries and interpersonal behavior was significantly impaired. His actions surrounding the alleged offense were organized and goal-directed but were based on delusional assumptions rather than an accurate appraisal of reality.

Shawn Chan
Page **7** of **10**

Risk assessment findings indicate an elevated risk for continued intrusive or stalking-type behaviors in the absence of treatment and supervision, driven by persistent delusional beliefs, poor insight, and limited protective supports. Overall, the evaluation supports the conclusion that Mr. Chan's cognitive capacities are largely intact. Still, his behavior and decision-making are substantially compromised by a severe mental disorder, specifically acute delusional disorder, mixed type (grandiose, persecutory, and erotomanic features), affecting reality testing, judgment, and appreciation of the wrongfulness of his actions at the time of the alleged offense.

This diagnosis is supported by the presence of longstanding, fixed delusional beliefs involving grandiosity, persecution, and romantic attachment that have persisted for many years in the absence of prominent hallucinations, disorganized thought, or cognitive decline, and that have directly guided goal-directed behavior while overall cognitive functioning and daily functioning outside the delusional system have remained largely intact. Without adequate psychological and psychiatric treatments, his overall prognosis is poor.

**DIAGNOSIS**
(F22) Delusional disorder, mixed type (grandiose, persecutory, erotomanic features), currently in an acute episode, severe

**RECOMMENDATIONS**
MEDICAL EVALUATION: Given that Mr. Chan has not received routine medical care or laboratory testing in many years, a comprehensive primary care evaluation is recommended, including a general laboratory panel, to assess overall medical status and to rule out any underlying medical conditions that could contribute to or complicate psychiatric symptoms.

PSYCHIATRIC EVALUATION AND TREATMENT: Mr. Chan would benefit from psychiatric treatment to address his delusional beliefs. A comprehensive psychiatric evaluation is strongly recommended to determine the appropriate psychopharmacological treatment, as medication is the most effective way to reduce the intensity and persistence of delusions. Because Mr. Chan has limited insight into his mental illness, treatment may be most effective in a structured, supervised setting.

BEHAVIORAL HEALTH: Supportive psychotherapy is also recommended to help Mr. Chan manage stress, improve coping skills, and gradually increase awareness of how his beliefs affect his behavior. Therapy should focus on practical goals, emotional regulation, and daily functioning rather than directly challenging delusional beliefs. Attention to sleep patterns and mood symptoms is important, as poor sleep and emotional distress appear to worsen his symptoms.

MONITORING OF SYMPTOMS: Ongoing monitoring of risk is advised, particularly given the persistence of beliefs about romantic attachment and perceived persecution. Coordination among mental health providers and supervising authorities is recommended to ensure consistent treatment and follow-through.

OTHER RECOMMENDATIONS: Placement in a treatment-oriented and structured setting is recommended rather than reliance on punishment alone. Court-ordered psychiatric treatment, including medication management and regular mental health follow-up, is advised to reduce the risk associated with untreated delusional beliefs.

Clear supervision conditions are recommended, including strict no-contact orders with the alleged victim and any other individuals connected to Mr. Chan's delusional beliefs. Given his ability to engage in

organized behavior based on these beliefs, supervision should emphasize clear rules, external structure, and monitoring, rather than relying on self-control or insight alone to prevent recurrence.

Restrictions on travel and limitations on access to potential targets may be appropriate risk-management measures. Periodic mental health reassessments are recommended to evaluate treatment response, symptom stability, and ongoing risk. With consistent treatment, supervision, and support, the likelihood of future intrusive or stalking-related behavior may be reduced.

*Thank you for referring Mr. Chan. Please don't hesitate to contact me at 813-992-9978 if further assistance is needed.*

Michelle Ayala-Feliciano, Psy.D.
Licensed Psychologist #PY9045

# ADDENDUM

Shawn Chan 42 y/o
Neuropsychological Tests Score Summary

| TEST/SUB-TEST | Standard Score | Scale Score | Percentile Rank | Clinical Classification |
|---|---|---|---|---|
| **EFFORT MEASURES** | | | | |
| Reliable Digit Span (6, 5, 8) RDS: 19 | | | | Above the Cutoff Score |
| Dot Counting Test  Score: 8 | | | | Normal Effort |
| **PREMORBID COGNITIVE ABILITY** | | | | |
| Test of Premorbid Functioning | 114 | | 82 | High Average |
| **SCREENING MEASURE** | | | | |
| RBANS-A Total Score | 102 | | 55 | Average |
| Immediate Memory Index | 103 | | 58 | Average |
| Visuospatial/Constructional Index | 126 | | 96 | Exceptionally High |
| Language Index | 83 | | 13 | Low Average |
| Attention Index | 97 | | 42 | Average |
| Delayed Memory Index | 103 | | 58 | Average |
| **INTELLECTUAL ABILITY** | | | | |
| WAIS-IV Full Scale IQ | 110 | | 75 | High Average |
| **ATTENTION/PROCESSING SPEED/MENTAL FLEXIBILITY** | | | | |
| DKEFS-Visual Scanning | | 16 | 98 | Exceptionally High |
| WAIS-IV Visual Puzzles | | 10 | 50 | Average |
| WAIS-IV Processing Speed Index | 102 | | 55 | Average |
| Symbol Search | | 10 | 50 | Average |
| Coding | | 11 | 63 | Average |
| WAIS-IV Working Memory Index | 105 | | 63 | Average |
| Digit Span | | 9 | 37 | Average |
| Arithmetic | | 13 | 84 | High Average |
| **LEARNING & MEMORY** | | | | |
| RBANS   List Learning | | 12 | 75 | High Average |
| List Recall | | | 51-75 | Average to High Average |
| List Recognition | | | 51-75 | Average to High Average |
| Story Memory | | 9 | 37 | Average |
| Story Recall | | 8 | 25 | Average |
| Figure Recall | | 11 | 63 | Average |
| **LANGUAGE** | | | | |
| RBANS-A Picture Naming | | | <2 | Exceptionally Low |
| WAIS-IV   Verbal Comprehension Index | 112 | | 79 | High Average |
| Similiarities | | 11 | 63 | Average |
| Vocabulary | | 14 | 91 | Exceptionally High |
| Information | | 12 | 75 | High Average |
| COWAT-FAS, Letter Fluency | | | 42 | Average |
| COWAT-Animals, Semantic Fluency | | | 97 | Exceptionally High |
| **VISUOSPATIAL/CONSTRUCTION** | | | | |
| RBANS-A-Line Orientation | | | >75 | High Average |
| WAIS-IV Perceptual Reasoning Index | 109 | | 73 | High Average |
| Matrix Reasoning | | 12 | 75 | High Average |
| Visual Puzzles | | 10 | 50 | Average |
| Block Design | | 13 | 84 | High Average |
| RBANS-Figure Copy | | 13 | 84 | High Average |
| **EXECUTIVE FUNCTIONS** | | | | |
| DKEFS-Number Sequencing | | 14 | 91 | Exceptionally High |
| D-KEFS-Letter Sequencing | | 13 | 84 | High Average |
| D-KEFS-Number-Letter Switching | | 12 | 75 | High Average |
| COWAT-FAS, Letter Fluency | | | 42 | Average |
| WAIS-IV Matrix Reasoning | | 12 | 75 | High Average |
| WAIS-IV Similiarities | | 11 | 63 | Average |
| D-KEFS-Color Naming | | 15 | 95 | Exceptionally High |
| Word Reading | | 15 | 95 | Exceptionally High |
| Inhibition | | 14 | 91 | Exceptionally High |
| Inhibition/Switching | | 13 | 84 | High Average |
| Token Test | | | 9 | Well Below Average |
| **MOTOR SKILLS** | | | | |
| Motor Speed | | 12 | 75 | High Average |

Shawn Chan
Page **10** of **10**