# U.S. District Court
# Middle District of Florida
# Tampa Division

# GOVERNMENT EXHIBIT

**Exhibit No.**:  4

Case No.: 8:25-cr-311-MSS-TGW

UNITED STATES OF AMERICA

vs.

 SHAWN CHAN

Date Identified: _____

Date Admitted: _____



## Forensic Psychological Report
## (CONFIDENTIAL)

**Regarding**: Shawn Chan
**Date of Birth:** 11/14/1983
**Case No.**: 8:25-mj-2165-CPT
**Charge:** Interstate Stalking
**Date of Report**: 3/5/2026

### REASON FOR REFERRAL:

Pursuant to the Court's order, I evaluated Mr. Chan's mental state at the time of the alleged acts.

### INFORMED CONSENT & LIMITS OF CONFIDENTIALITY:

Informed consent was obtained from Mr. Chan after he was apprised of the nature and purpose of the evaluation, and how the information obtained might be used. He was also informed of the limits of confidentiality inherent to forensic evaluations. He was told a report would be written following the interview, and that anything he reported could be included in the report. He was informed I may be asked to testify in Court regarding the evaluation. Mr. Chan verbalized a sufficient understanding of this advisement, and he agreed to participate.

### Sources of Information:

1. Forensic interview, behavioral observations, and psychological screening with Mr. Shawn Chan at the Hernando County Detention Center on 2/11/2026, lasting approximately three hours
2. Indictment on the above case
3. Criminal complaint by Special Agent Adam Godfrey, dated 6/6/2025
4. Handwritten note by Mr. Chan left at the victim's residence
5. Victim's residence surveillance videos
6. Mr. Chan's iPhone records at the time of the incident in question
7. Transcripts and audio from the initial interaction with investigators and Mr. Chan
8. Body camera footage at the time of the arrest of Mr. Chan
9. Neuropsychological evaluation completed by Dr. Michelle Ayala-Feliciano, dated 10/24/2025
10. Psychological evaluation report dated 9/11/2025 by Dr. Debra Goldsmith
11. Hernando County Detention Facility records
12. Orange County Sheriff's Office incident report, number 25-031988
13. Pasco County Jail records were not made available to me by the time this report was completed

Debra K. Carter, Ph.D.

Patricia A. Bach, Ph.D.

Matthew P. Carter, Psy.D.

Amy L. Gambow, Ph.D.

Thomas Longo, Psy.D., MS

Christine A. Profito, Psy.D.

Kristen Sidwell, LCSW

Michael B. Spellman, Ph.D.

Jared Warren, Psy.D.

Karim Z. Yamout, Psy.D., ABPP-CN

Mailing Address:
4835 27th Street West
Suite 125
Bradenton, Florida 34207

t. 941.753.0064
f. 866.636.1355
www.CarterPsych.com

## RELEVANT PSYCHOSOCIAL HISTORY:

Mr. Chan is a 42-year-old Chinese male who was born in Hong Kong. Mr. Chan stated that his first language is Cantonese and that he learned English around age 6 when his family, including his parents and sister, relocated to Canada for "work" (in the restaurant industry).  He described his relocation to Canada as "it was a culture shock," and he had difficulty adjusting to life in an isolated area of Quebec.  Mr. Chan described his childhood as involving "very strict discipline, and sometimes it got excessive. They (parents) would spank me, but it was a lot." He reported "sporadic" physical abuse by his mother and felt that the level of discipline exceeded what would be considered typical corporal punishment.  He felt his childhood has contributed to episodic depressive episodes throughout his life.

Despite early language and cultural challenges, Mr. Chan completed the 12th grade in regular classes and denied any history of a learning disability.  In his early 20s, Mr. Chan moved to Ontario to distance himself from his family and to live in a more populated area. He explained, "I was tired of the small, isolated town and it was boring. I was having some depression, and the strained relationship with my parents. We grew up poor, we had different views and opinions and the more I grew up, I resented that I was removed from my Asian culture."  While in Ontario, he attended Centennial College to study "computers," completing two years successfully.  He then enrolled at York University to continue studying computers and remained there for five years.  He took a year off at one point to travel to China.  While his initial goal was to live in China for one year, he stayed only 6–8 months. While in China, he was romantically involved but described the relationship as toxic and unstable. He again experienced "culture shock" and found it difficult to fit in, stating that although he reconnected with extended family, "it wasn't easy, even my relatives noticed, I was a little bit different and I had to readapt."

Mr. Chan did not complete his studies at York University, explaining, "the level of difficulty and the budget. It was getting more and more expensive, and I had to find ways to get a job but then I get tired and less time for studying and myself."  Throughout this period, he was self-employed repairing computers, a business he continued after leaving college.  He lived with friends, became involved in the Asian community, and reported an improved sense of belonging.

Leading up to his current arrest, Mr. Chan lived in Scarborough and continued working in computer repair. He lived in a house owned by one of his friends with three roommates and reported that he "occasionally" contributed financially depending on his income. Mr. Chan stated he "grew apart" from his parents and sister after leaving Quebec.  Mr. Chan has not spoken with his family or friends since his arrest, and per his report, they are unaware of his current legal involvement.

Before his arrest, Mr. Chan spent much of his free time playing video games and watching World Wrestling Entertainment (WWE) content. He reported that he has been a lifelong "fan boy" of WWE. Although he and his friends engaged in playful wrestling as children, he never participated in wrestling formally in school or as an adult and stated that he has never attended a WWE event (until his arrest). As he grew older, his viewing increased substantially due to greater online access, and in the period immediately preceding his arrest, he spent the majority of his waking hours watching WWE. When asked whether this impacted his daily functioning, he stated, "the more I watched it, the less time I did my chores." Mr. Chan initially did not believe his viewing was addictive; however, after his arrest, he recognized that his consumption had become excessive. He reported that he had considered reducing his WWE viewing before his arrest, but "it was harder than it looks," and he experienced "cravings and urges" to watch it when he tried to cut back.

## MENTAL HEALTH, SUBSTANCE USE, AND MEDICAL HISTORY:

Despite describing symptoms consistent with a major mental illness (reviewed below), Mr. Chan reported no history of psychiatric admissions or outpatient mental health treatment.  He stated he has never been

diagnosed with a mental illness, and he has never taken psychotropic medication.  Mr. Chan is not currently receiving mental health treatment in the Hernando County Detention Facility, though he stated he attended a few NAMI group meetings to see if they could help him secure housing if he were released on bond.

While Mr. Chan has never been treated for a mental illness, Mr. Chan endorsed symptoms suggestive of psychosis, including auditory and visual hallucinations, delusional thought content, and ideas of reference.  Regarding auditory hallucinations, Mr. Chan believes that he "hears the voice of God, and I follow the voice of God."  He first began hearing God's voice in his early 20's when he became involved in Christianity, and ever since, "it became more and more frequent," including daily.  He stated that God's voice tells him: "what to do, how to do it, and when to go."  When asked for examples, he reported, "I went to Liv Morgan's house, to seek her out, to discuss about her conduct. But also, my romantic feelings for her over time, ever since the YouTube channel. I also wanted to meet her and ask her out at the same time."  When asked for other examples of when he hears God's voice speak to him, he described, "when I see someone outside in the streets, when they aren't conducting themselves the way they should, I felt compelled to correct them, to preach to them."  Mr. Chan described God's voice as "a male voice, it's loud, but it's not noisy.  It's clear, when I see something, I connect with him, and I see the solution."  He believed that God's voice was separate from his own thoughts. Although he said the voice came from inside his head, he explained that "it's very distinct, I can hear his voice and my own."

Mr. Chan reported that he continues to hear God's voice since his arrest, though he stated he does not share this information with anyone due to fear other inmates will target him.  He maintained the belief that the voice of God he was hearing was real and not a product of his mind.  When I asked if he ever resisted God's voice, he replied, "I tried, but the more I studied the bible and Christianity, I need to love him more, so I obey more. I resist less."  He explained that God will instruct him to do things "against the moral world, but in the spiritual world it's the right solution."  When asked if God tells him to hurt people, he said, "sinners (friends and strangers), like to hurt them, beat them, send them back to their maker;" however, he stated he has never acted on these commands to hurt others, and he will "find another way to correct them and pray to God that he will correct them, so I don't have to do something that has earthly consequences."

Regarding substance use, Mr. Chan verbalized no prior history of illegal drugs or alcohol misuse.  He reported that he "occasionally" consumes alcohol, which he described "during special occasions, a couple glasses of beer, or alcohol mixed with juices."

Medically, Mr. Chan has not seen a doctor in over 20 years.  He reported no major medical conditions to his knowledge.  He has never had a seizure or a traumatic brain injury (TBI).

**RECORDS REVIEWED:**

*Psychological evaluation completed by Dr. Goldsmith, dated 9/11/2025*: Mr. Chan was referred for an evaluation regarding mitigation by defense counsel.  He was reported to be cooperative though he "appeared to be very paranoid and guarded."  Dr. Goldsmith provided the opinion that Mr. Chan was competent to proceed, despite his delusional beliefs.  He was not engaged in psychiatric treatment at the time of the evaluation, and Dr. Goldsmith recommended he be evaluated to determine appropriate psychotropic medications.  Diagnostic impressions included Delusional Disorder and Adjustment Disorder with depressed and anxious mood.

*Neuropsychological evaluation completed by Dr. Feliciano, dated 10/24/2025*: Mr. Chan was referred by his defense counsel for a neuropsychological evaluation, possible insanity, and potential for dangerousness in the community.  Several measures were administered.  He was noted to be cooperative, though "suspicious and guarded."  He was noted to be "tangential at times," and he verbalized "obsessions, delusions of grandeur, erotomania, and paranoia."  No signs of feigning were determined in the

psychological testing. Despite signs of thought disturbance, neuropsychological testing found "overall intact cognitive functioning, with intellectual abilities in the high average range and no evidence of an acquired neurocognitive disorder."

It was documented that Mr. Chan's mental disease significantly impaired his ability to appreciate the wrongfulness of his actions at the time of the alleged acts. Regarding risk, it was noted that Mr. Chan exhibited an "elevated risk for continued intrusive or stalking-type behaviors in the absence of treatment and supervision, driven by persistent delusional beliefs, poor insight, and limited protective supports." Mr. Chan was diagnosed with Delusional Disorder, mixed type (grandiose, persecutory, erotomaniac features), currently in an active episode, severe. Several recommendations were made, including a referral for a medical evaluation, psychiatric evaluation and treatment, supportive psychotherapy, ongoing monitoring of symptoms, and placement in a treatment-oriented setting. Supervision, travel restrictions, and no-contact orders were also recommended.

*Hernando County Detention Facility*: In a note dated 7/3/2025, Mr. Chan completed a medical screening, with no major issues documented. In a psychosocial questionnaire dated 7/11/2025, no mental health treatment history was noted. He denied hallucinations or signs of depression. He was alert and oriented. On 1/28/2026, he placed a sick call request stating that he was diagnosed with a mental illness and requested a bottom bunk. In a note dated 1/29/2026, he was described as guarded, though there were no signs he was responding to internal stimuli. He declined to sign a release to obtain medical records.

## MENTAL STATUS/BEHAVIORAL OBSERVATIONS:

Mr. Chan was seen at the Hernando County Detention Facility. He ambulated himself to the interview independently, and he remained seated during the entirety of the interview. He presented as fully alert and oriented to date, person, place, and situation. He was dressed in jail attire appropriately. There were no major issues observed in his grooming or hygiene. His eye contact was fair, and the volume, rate, and tone of his speech were within normal limits. He was cooperative and respectful throughout the evaluation by answering all questions.

Mr. Chan described his mood as "depressed" due to being incarcerated. He described depression as "sadness, lonely, even if I'm surrounded by other inmates." He denied any present thoughts of wanting to harm himself or others. When asked about his sleep, he answered, "they wake us up for meals at weird times, so I eat and go back to sleep." Most days, he will "eat and sleep, sometimes watch T.V." His appetite was low during his initial incarceration, and now, "it became more over time. I became more hungry. I lost a lot of weight." His range of emotional expression was within normal limits, and he managed his behavior.

Mr. Chan's thoughts were generally organized, though he verbalized delusional beliefs regarding having special relationships with WWE professionals and that his ideas had been stolen by WWE personnel. His responses were generally direct, though occasionally he gave lengthy detailed answers that were minimally related to the question asked. There were no signs of hallucinations, including no indications he was talking to himself or smiling/laughing inappropriately. There were no signs of mania, such as pressured speech, flight of ideas, or increased energy.

While I did not perform formal cognitive testing, I did not observe any significant impairments in Mr. Chan's overall cognitive functioning. His attention, comprehension, and memory functioning were sufficient for the purposes of the evaluation. His insight into his delusional beliefs and auditory hallucinations was limited, though he acknowledged his obsession with the WWE, which negatively impacted his functioning prior to his arrest. His judgment was fair. He behaved appropriately throughout the interaction and demonstrated the ability to read social cues and adapt his behavior to a jail environment.

These observations suggest he was capable of managing his actions in a socially suitable and flexible manner despite the presence of underlying delusional beliefs.

I administered the *Miller Forensic Assessment of Symptoms Test (MFAST)*, which is a brief measure used to screen whether the individual is feigning psychiatric symptoms. Mr. Chan's total score fell right at the standard cutoff that would suggest possible feigned or exaggerated symptoms. His performance does not definitively indicate malingering, though it does suggest that he endorsed more atypical or improbable symptoms compared to genuine psychiatric populations to raise concern. However, his cultural background must be taken into account when interpreting the results. It is possible that his cultural and linguistic background contributed to some degree of misunderstanding, which may have unintentionally inflated the score. Considering his self-report in the current interview compared to available collateral information, I do not believe Mr. Chan was intentionally feigning his mental illness.

**DISCOVERY INFORMATION:**

Per the criminal complaint, on or about 5/26/2025 – 6/3/2025, Mr. Chan reportedly flew from Scarborough Ontario to Orlando. During the interview at a point of entry, he stated he was staying at the Performance Center of a Sports Entertainment Company in Orlando; however, this does not have any rooming or lodging.

On 5/31/2025, Mr. Chan traveled to the residence of a member of the Sports Entertainment Company. The member had surveillance cameras at their residence that captured Mr. Chan's presence. He approached the residence through the yard (rather than the driveway) and walked around the property twice. He attempted to enter a detached barn through a side door. He walked to the front porch of the residence and looked around under the door mat area. He grabbed the front door handle and attempted to open it.

While also at the residence, Mr. Chan grabbed an air rifle pellet gun from the front porch and held onto it. Mr. Chan left a handwritten note on the front porch which included his phone number and residence. He remained on the property for two hours and left around 7:50 PM.

On 6/3/2025, Mr. Chan went to an event at the Performance Center. He was subsequently arrested when he was recognized. He had two bottles of liquid with Chinese writing on them, which he stated were medicines and one was to treat injuries related to bleeding.

An interview with the victim indicated that the victim did not know Mr. Chan.

*Video interview with Mr. Chan and detectives as well as body camera footage on 6/3/2025 into 6/4/2025*:

While being detained by police officers at the Performance Center, Mr. Chan was calm and cooperated. He was sitting in a golf cart while police completed their duties.

During the interaction with officers, Mr. Chan made several comments regarding his thoughts and behaviors. Mr. Chan said he came to the Orlando area to vacation and attend WWE events. He first denied having visited any wrestlers' homes when asked directly. A little while later, he mentioned having gone to Tampa, though he did not mention the victim's home. When shown a picture of him at the victim's house, Mr. Chan stated he had gone there to personally deliver a letter. He did not respond when officers confronted him about his initial lie of not visiting anyone. He indicated the victim's house was the closest in proximity. Mr. Chan made statements that he did not break in, and that he did not have any intention of danger. The officer asked if he would have done anything different, he said, "just a formal visit, to the front door." When the officer confronted him about showing up unwelcomed, he said that the victim made a statement in an online video about visiting their house. He stated he was only going to leave a letter, and in

minimizing his actions, he also stated that salespeople act similarly by going door to door.  He said he just wanted to "clear things" up, and he reported he was "not obsessed" with the victim.

Mr. Chan vaguely commented that this was the only way, and that he was out of options. He also made statements that if the victim did not like him or love him, they could just ignore him.  The officer told him that the victim did not know him, and Mr. Chan said that the victim does remember him, and he mentioned how he had spoken with wrestlers online.  Mr. Chan reported that he tried really hard to move on with his life. When talking to officers, Mr. Chan expressed his behavior was noncriminal.  He stated the victim's gate was opened, and when the officer told him the Judge signed a warrant for his arrest, Mr. Chan said he had worked with Chicago Police Department and judges in the past, and that a Judge would not do this without understanding.  He said it was "just a casual visit."

At one point, Mr. Chan commented that he recognized the officers as actors.  He told officers to call the Canadian military who will speak on his behalf, and he also referenced having connections with the Chicago Police Department and assisted with solving murders.  He commented briefly that he was involved in the military. He reported the WWE spies on him every day, including watching his every move using cameras or satellites.  Mr. Chan stated the WWE refuses to contact him, though they have continued to steal his ideas from high school.  He believed they could hear and see everything he does.  Mr. Chan commented that Vince McMahon was trying to get him arrested and laughing at him while watching.

Once transported to the police station, Mr. Chan sat in a room alone for 1.5 hours, without any signs of responding to internal stimuli or major mood instability.  When detectives entered the room, Mr. Chan immediately reported that he wanted a lawyer present. He gave pertinent background information when detectives asked.  He was told he was charged with burglary, and he only asked for a lawyer.

_iPhone records_: Mr. Chan's flight and hotel information were listed.  He landed on 5/26/2026, and searched Wyndham's hotel website on 5/29/2025.  He also browsed Expedia on or about 5/27/2025.  He did an online search for wrestling professionals that live in Florida (on or about 5/27/2025).  There are repeated google/safari queries from 5/27 – 5/29/2025 regarding searches of WWE professional homes.  He also searched other wrestlers online (The Rock, Hulk Hogan, John Cena).

## DEFENDANT'S ACCOUNT:

_Prior to conducting the evaluation, I briefly assessed Mr. Chan's competency before proceeding.  It is my opinion that Mr. Chan presented as competent to proceed with making informed decisions in his case and participating in the evaluation process._

When asked about circumstances leading to his arrest, Mr. Chan first began talking about distress related to the pandemic: "all those years of fear of uncertainty, whether COVID exists or not, the fear of death. Even after COVID, there is some PTSD, and those have a hard time re-adjusting back to the original life. For me, I was so exhausted.  I wanted a break from my own life, so that's when I decided to take a vacation even though I had a tight budget. I chose Florida because of the WWE Performance Center. I chose Orlando and heard about all the other landmarks all in one place, so I chose Orlando.  The PTSD from COVID and from my childhood, from everything, I wanted a vacation, despite my tight budget."

Mr. Chan reported he purchased an expedited passport, though to get it expedited, he had to purchase a plane ticket to Orlando.  He obtained his passport with 1-2 days, and he flew to Orlando "right away." When asked why he told airport personnel he was staying at the Performance Center, Mr. Chan said, "I thought they had lodging and that I could stay there."  He explained he had not searched for lodging prior to coming to Orlando, and he later discovered that they did not have lodging at the Performance Center. He described his actions as spontaneous: "it was like a road trip, a blind vacation.  When you don't book

Chan, Shawn

anything in advance, and you book after you're there. It's impulse, spur of the moment." He reported that he stayed at the airport initially, and during the day he would "just touring and looking around. Sometimes I just took naps at the airport so I could save money from paying hotels. They have Wi-Fi, so that's when I check on my iPhone what kind of tourists' attractions are in Orlando."

Upon his arrival, Mr. Chan said he "toured the city for a few days" and he felt "relief, and things I've never seen before. The Florida weather. The rain compared to the icy snow. It was completely different. I was a happy tourist." A few days after landing, Mr. Chan booked a room at the Super 8 Motel so he could "shower and all that." After one night at the motel, he reported returning to the airport for another few days before booking a second night at the Super 8 Motel.

Once in Orlando, Mr. Chan reported he started googling "many of these wrestlers because the older generation I grew up idolizing live in Florida. I thought it was once in a lifetime chance, and I didn't know if I would have the time or money to ever visit their houses." He explained that he searched the victim's house, and he added, "she was not the first on the list (to visit), but she was one of the last." He stated he selected the victim's residence because "she was the only one closest to my location. She was the only address I could reach from my location." Mr. Chan said he had not thought about visiting the victim before coming to Florida. It was not until he was in Orlando that he decided to visit wrestlers.

Mr. Chan reported that he decided to travel to the victim's residence "not knowing laws were different from Canada. I always thought that my American neighbors thought alike, like us, the only thing different is the money. I didn't think that Americans, even though I heard stories about guns and 'get off my lawn,' I didn't think she (the victim) would be like that. I took the chance to visit her house and knock on her door, and I presented myself as a fan boy. Take a bold move and ask her out, and if she rejected me, I would just leave. I didn't think the Florida law would actually arrest me. In Canada, it would not happen like that." I asked if Canada had similar laws to his current charge, which he responded, "they would not be oversensitive. I didn't think I would get arrested just for knocking."

Mr. Chan took a Greyhound bus to Springhill. From there, he walked in the direction towards her house, though he "got so exhausted," and he stopped at a gas station to call for a taxi. The taxi dropped him off at the victim's residence. Mr. Chan stated that once he arrived at the victim's residence, he had planned to "preach for God, reach out to Vince McMahon for the fan boy inside of me, and ask her (the victim) on a date for myself." With clarification, he explained that he wanted the victim to contact Mr. McMahon on his behalf because he was "a fan of him too," and he was hoping to meet him. When asked what he perceived was going to happen when he approached the victim at her home, he said, "no ideas, it was just spontaneous. See how things go." When asked what he would have preached to the victim, he answered, "because God told me the reason they fight all the time because of pride, just like UFC is known for fighting and pride. Pride is one of the 7 sins of Christianity. Also, the way they fight and yell at each other, that's wrath, another sin."

Mr. Chan reported no one was home at the victim's residence, and he added, "since no one was home, it was a once in a lifetime chance. I know it's not very nice or polite, it's a little bit wrong, so I walked around her house once, just to see if it looks exactly the same as the videos. She made tour videos of her house." Mr. Chan reported he turned the doorknob to see if it was locked, and when asked why he checked if the door was locked, he replied, "just curious, it was a moment of weakness, I lost my moral control, but I didn't do anything else." However, he also mentioned that he heard noises, which he later realized were animals. If it were unlocked, when asked what he would have done, he replied, "I would not have opened it. I would have backed off." When asked why he picked up the pellet gun, Mr. Chan said, "I was surprised and worried that she would have something like that, that a girl would have something like that because I thought it looked real." When he picked it up, he "wanted to inspect it, and I wanted to make sure it was

safe and that she really knew how to operate it.  After I realized it wasn't real, I tried the trigger to make sure, it was empty."

Mr. Chan reported that he stayed on her porch "for a while," and when asked why, he answered, "I sat there for two main reasons.  I was tired because I walked the first half. I was trying to rest. At the same time, I was writing a piece of note.  I was hearing the voice of God and all these mixed emotions, and the feeling of disappointment of not meeting them in person because I had tight budget."  When asked about writing the letter, he answered, "it was a so-called disgruntled letter, you know in WWE they like to yell and fight each other, and I wrote a bunch of it."  When asked what he meant by mixed emotions, he answered, "disappointment, my romantic feelings for her, I feel rejected even though I never talked to her, not able to meet Vince McMahon. The feeling that I wasted my money and my time."

I inquired about the content of the letter he wrote, and Mr. Chan explained, "all of them that I played with (WWE wrestlers), including her, were trying to reach out to me… send me email, or a message in the game. They were trying to ask me where I've been."  He described that he "strongly believed I talked to them online (through Final Fantasy 11) when they were younger and before they were famous but so far, they've all been denying it."  Mr. Chan reported he was in his 20's when this occurred, and he has not had any means of communication since.  When asked what they would talk about in the video game, he replied, "average things, playing video games together, we were inside the video games." When asked what made him think he was speaking with these wrestlers online 20 years ago, he said, "their username correspond to their real-life name or their wrestling name they are using now, but back then they were not famous, so what are the coincidences?"  He explained he had friendly relationships with them online.

When I again asked about the content of the letter he wrote, Mr. Chan said, "sometimes in the interviews and storylines, they be trying to reach out to me and talk to me."  He reported he felt as if they were giving him personal messages during their online interviews, and when asked for a recent example, he said, "they said they tried to contact me, that I went dark on them, all that smack talk. They are using it in the storyline and people are laughing."  Mr. Chan explained the victim was one of those who tried to speak to him through "anyway they can, either through the storyline or in their interviews or candid's, they've been trying to reach out to me and find out where I am," since he quit playing the game 20 years ago.  When asked why he did not reach out to them if he believed they had been trying to contact him this whole time, he said, "because I lost my income, I needed to pay for the game because it was monthly."

Once he felt rested and completed the note, Mr. Chan reported he returned to the main road and hitchhiked to a gas station.  While in the car with a neighbor who picked him up, they did not discuss anything related to wrestling or the victim.  He returned to the Greyhound station and proceeded back to Orlando.  For the next several days, Mr. Chan said he continued touring to "places I always wanted to visit," and he continued to "couch surf" at the airport.  When asked how he was feeling at that time, he said, "same mixed emotions, I started to worry about how I can mend my failure to God."

When asked if there were consequences from God for not being able to preach to the victim, Mr. Chan said, "I was worried about the spiritual consequences of God rather than the earthly consequences of trespassing."  When asked about the spiritual consequences that may have happened, he said, "that I would go to hell or be left behind in the raptor, for judgment day.  She (the victim) is part of a group judgement day.  It's in her story line.  There was a connection.  I saw that as a hint from God."  When asked if God spoke to him again about preaching to the victim, he said, "not yet, he knew I failed to preach and I came back empty handed."  Mr. Chan said that God has not addressed him directly about his "failure to preach" to the victim, though God continues to speak to him in other regards.  He stated God continues to tell him to "have faith in the moral world, my legal case, that I should be more worried about the spiritual consequences of not being able to preach to her (the victim)."  He stated God has not given him explicit consequences to his failure yet.  Mr. Chan further explained how God had told him to preach to all of WWE

wrestlers for the way they dress and behave in lustrous, prideful, and wrathful ways. He felt "conflicted" himself because he had been watching the WWE while also identifying as Christian.

During the arrest, when asked what he was thinking, Mr. Chan replied, "confused, I didn't know what was going to happen. I didn't know why he (the officer) came to me. When he cuffed me, I thought it was just a storyline, that they were filming, that they picked me as one of the fans to film getting arrested, which happens all the time in story lines. I felt angry and outraged that it was a real arrest." Mr. Chan indicated that if Hulk Hogan were closer, he would have gone there instead. He stated this was the first time he ever attempted contact with the victim, and he only previously sent "fan letters" to the company as a whole.

I asked what he meant by "stalker" in the letter he wrote, and Mr. Chan reported, "I was having mixed emotions, the word I wanted to say was 'nobody' not stalker." When asked why he left his phone number and address, he said, "I wanted to reconnect with her and the other friends I spent time with. I finally wanted to give them my contact information." When asked what would have happened if they contacted him through the phone number left, he stated, "be happy, spend time together again, and try to preach to them rather than hurting their feelings." He reported that the God had told him the devil had been using "nuclear weapons in the moral world to threaten us." Mr. Chan said he was trying to fight against the devil, and he wanted to "warn them" (WWE) and "protect them, preach to them."

While Mr. Chan acknowledged he had no relationship with the victim, he "feels like she's my significant other. I feel like we belong together." When asked why he felt this way, he reported, "because of her personality, and she has the same love and passion for wrestling." When I asked what he would think if the victim said otherwise, he reported, "I've been mentally preparing myself for that. If she rejects my romantic aspect, I will understand. I would be sad and heart broken, but I wouldn't do anything about that."

Mr. Chan reported the over-the-counter medicine he had on him at the time of the arrest was for "bleeding and arthritis." He stated he had not consumed any alcohol and had not used any illegal drugs.

**DISCUSSION OF MENTAL STATE AT THE TIME OF THE ALLEGED OFFENSE:**

The purpose of this evaluation is to assist the trier of fact in determining whether the defendant was insane at the time of the alleged offense. *Insanity—18 U.S.C. § 17:*

It is an affirmative defense under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.

*Based on the totality of the evaluation, my diagnostic impression includes:*

- Delusional Disorder, mixed type, continuous

Delusional disorder includes the presence of one or more delusions with a duration of one month or longer. In Mr. Chan's case, this has been present for much of his adult life, including his hallucinations that are related to his delusional themes. Outside of the influence of his delusional beliefs, his overall functioning does not appear to be markedly impaired or overly disorganized. While he noted that he experiences command hallucinations, it is unclear whether his hallucinations consistently dominate his thinking to warrant a diagnosis of a Schizophrenia spectrum disorder. He has had some degree of mood fluctuations, though it does not appear to rise to the level that greatly interferes with his daily functioning.

_Assessment of defendant's mental state and functioning at the time of the crime:_

Prior to the incident in question, Mr. Chan had never received treatment for a mental illness. However, for much of his adult life, Mr. Chan described symptoms consistent with a severe mental illness characterized by auditory hallucinations (hearing the voice of God) as well as complex delusional beliefs involving WWE professionals, spiritual missions, and having exceptional importance.

There appears to be both psychotic and non-psychotic reasons for Mr. Chan's behavior leading to the crime in question. His behavior surrounding the offense, including navigating travel, sightseeing, and selecting the victim's residence partly because it was geographically closest, is considered organized and goal directed. However, he was also influenced by his delusional beliefs towards the victim as well as commands from God to visit the victim's residence. In his own account (consistent with available iPhone records reviewed), he researched the residences of several wrestlers after arriving in Florida because he believed it was a rare opportunity to visit their residences. He explained that he had not planned in advance to visit the victim's residence specifically before the trip, and he reported that he was motivated by being a "fan boy." He characterized his behavior as spontaneous, and his statements suggested that some portion of his actions could be understood in the context of curiosity and opportunity rather than purely psychotic compulsion. However, these non-psychotic motivations appeared to function as a secondary factor and integrated within Mr. Chan's delusional belief system. Organized behavior does not negate one's ability to appreciate the wrongfulness of their conduct.

On one hand, several features initially suggest thought organization and rational thinking. Mr. Chan demonstrated organized behavior before and during the incident, such as planning travel, researching wrestler addresses, navigating transportation, and selecting the victim's home partly because it was closest to his location. He acknowledged in retrospect that walking on someone's property uninvited might be socially inappropriate, and his statements could be interpreted as showing some capacity to appreciate social norms. He also exhibited moments of seemingly rational thought, including recognizing that he might be rejected romantically and describing his actions at times as spontaneous and impulsive. Taken at face value, these points could be seen as indicators that, despite his mental illness, he retained at least some awareness that approaching a stranger's home and attempting to open a door was not altogether appropriate behavior. It is possible that this perspective reflects a retrospective interpretation rather than his actual mindset at the time of the incident.

However, looking more closely at the full picture shows that these brief acknowledgments do not outweigh the fact that Mr. Chan's severe mental illness greatly disrupted his ability to understand that what he was doing was wrong. His motivations were overwhelmingly shaped by fixed delusional beliefs. He reported hearing the voice of God instructing him to preach to WWE wrestlers, believed the victim may be his significant other, and he thought that failing to preach to the victim would result in divine consequences rather than legal ones. At the time of the offense, Mr. Chan assessed his visit not as intrusive or threatening but as divinely sanctioned and relationally appropriate. He expressed fear of the spiritual consequences while showing little understanding of the illegality of his conduct. He even interpreted his arrest as part of a WWE performance storyline rather than a real legal event. These delusional interpretations reveal that his moral framework during the incident was dominated by a psychotic thought process, not reality-based judgment.

Despite his delusional beliefs, Mr. Chan did not appear grossly disorganized during or after the offense. He provided coherent explanations of his travel, his sequence of actions, and his emotional state. He argued that if this occurred in Canada, he would not have been arrested. This may suggest some retained capacity for organized reasoning, though this is likely a reflection of his hindsight. His persistent delusional belief

that he was known by WWE professionals, that he was following divine instruction, that WWE was communicating with him through coded messages, and that his arrest was not real but part of a storyline, strongly indicates that his mental illness fundamentally distorted his capacity to recognize his conduct as wrong. Therefore, although there are elements that superficially support intact moral understanding, it is my opinion, which is based on a reasonable degree of psychological certainty, that **the weight of the evidence suggests that due to Mr. Chan's severe mental disease, he was unable to appreciate the wrongfulness of his actions at the time of the offense.**

Following his arrest, Mr. Chan expressed confusion over his legal involvement and lacked any understanding of his mental state. He continued to express beliefs that he and the victim may be connected, which indicates this was not a transient or situational event, but rather an enduring delusional belief rooted in a psychotic thought process. His time in custody has given him the opportunity to reflect on his actions and view them from a more typical societal perspective, which may explain some of the more rational-sounding statements he now offers. Such reasoning is commonly seen in individuals experiencing delusions, as they try to make sense of why their behavior is now viewed as problematic when they did not perceive it as wrongful at the time. While I considered the possibility of malingering, and I performed a screening measure that fell at the cut-off, I do not believe Mr. Chan was attempting to fabricate his belief system. My observations were consistent with all available collateral information, including Mr. Chan's presentation on police body camera footage, suggesting that he has presented himself in a forthcoming manner.

This completes my evaluation of Mr. Chan's mental state at the time of the incident in question. Please reach out to me if there are any questions pertaining to these findings.

Respectfully,

Amy Gambow, Ph.D.
Licensed Clinical Psychologist